# Illinois Official Reports

## Appellate Court

---

### *People v. Wallace*, 2020 IL App (1st) 172388

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMONT WALLACE, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-2388 |
| Filed<br>Rehearing denied | March 27, 2020<br>May 11, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-9836; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian A. Levitsky, Assistant State's Attorneys, of counsel, and Victoria Bell, law student), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Cunningham and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a jury trial, defendant Raymont Wallace was found guilty of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and sentenced to 2½ years' imprisonment. On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt because the State failed to present sufficient evidence that he was in a "dating relationship" with the victim. He also argues that the court abused its discretion by not providing the jury with a nonpattern instruction in response to a jury note asking "what the law says a relationship is." We affirm.

## I. JURISDICTION

¶ 3     The trial court sentenced defendant on September 14, 2017. He filed his notice of appeal on September 14, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

## II. BACKGROUND

¶ 5     Defendant was charged by information with two counts of aggravated domestic battery and one count of domestic battery, stemming from a June 11, 2016, incident involving Teryl Busch.

¶ 6     Busch testified that she knew defendant for approximately five years prior to June 11, 2016, and, on June 11, 2016, was in a dating relationship with defendant. She had been dating defendant for approximately six to eight months. She also had been "with him" three years prior to the date in question. She explained that they saw each other every night, had a sexual relationship, and communicated during each day. When Busch would receive her welfare check, the pair would go shopping. Defendant kept items at Busch's apartment, including a shirt and toothbrush.

¶ 7     On June 11, 2016, Busch was at her apartment on West Hollywood Avenue. Defendant came over and demanded $40. After Busch refused to give him the money, he grabbed her by the neck and pushed her toward the window where a chair was located. Busch stated that she could not breathe and was able to slide off the chair and out of his grip. She fell to the floor, and defendant started hitting her on the head and face, causing her ear to bleed, knocking out her teeth, and breaking her jaw. Defendant then grabbed his bike and left the residence. Busch called 911 and told them her boyfriend had hit her. She was transported by ambulance to Swedish Hospital for treatment. Busch identified People's Exhibit Nos. 1 through 3 as accurate photos of her appearance on June 11, 2016, and these photos were published for the jury.

¶ 8     On cross-examination, Busch testified that she initially only knew defendant as "Cas," which was short for Cassanova. She considered defendant her boyfriend because of the time he spent at her house. She stated that she "groomed him" and that he kept her company. She explained that he helped her once in a while and "was loving." On June 11, Busch called defendant and told him she was headed home before he came over. She acknowledged that she told a detective and assistant state's attorney on June 12, 2016, that her relationship with defendant was strictly "bed partners." She denied telling the detective and assistant state's attorney that she and defendant did drugs. She clarified that defendant's visits were more for company than anything sexual.

¶ 9 Chicago Fire Department Lieutenant Gary Creager testified that on June 11, 2016, about 6:30 p.m., he responded to a battery call on West Hollywood Avenue. There, Creager observed a female victim crying hysterically and saying her boyfriend tried to kill her. She was bleeding "pretty heavily" from her right eye and mouth and holding a tooth in her hand. Creager identified photos of Busch depicting the injuries he observed.

¶ 10 On June 11, 2016, Chicago police officer Dinkha responded to a call and observed Busch, who had cuts, bruises, and a lost tooth.[1] Busch was crying, in pain, and very furious. Dinkha obtained a description of Busch's perpetrator from her at the hospital, and an evidence technician was called to take photographs of her. Dinkha relayed the description on her police radio. Chicago police officer Ricardo Fernandez, who was on duty near Clark Street and Ridge Avenue, saw a man matching the description provided by Dinkha. Fernandez placed defendant into custody. On cross-examination, Fernandez stated he did not observe any injuries to defendant's hands and defendant did not tell Fernandez about any injuries.

¶ 11 The State rested. Defendant made a motion for a finding of acquittal based on insufficient evidence of the injuries and of a domestic or dating relationship between him and Busch. The court denied the motion, finding that whether there was a dating relationship was something for the jury to determine.

¶ 12 Dr. Anne Newbold examined Busch at Swedish Covenant Hospital at 7:47 p.m. on June 11, 2016. She testified that Busch admitted to alcohol use that day. Busch had a laceration by her right eye, pain and a bruise to her right shoulder, one of her teeth had fallen out, and had a small facial fracture near the missing tooth. On cross-examination, Newbold stated Busch's blood alcohol level was 0.03, which is a "low level," and there were no tests administered to determine if Busch was under any other medication or substances.

¶ 13 Defendant testified that he and Busch were "bed buddies." He explained this meant they were two people who just have sex, and, in this case, they used drugs together. Defendant provided marijuana, and Busch provided crack cocaine. Busch often wanted defendant to bring drugs to her house, and he would comply. He denied ever going shopping or going to grocery stores or movies with her. Defendant stated that their relationship started in 2012. In 2014 or 2015, defendant broke up with Busch because she would drink and accuse him of "things." In 2016, they got back together. On June 10, 2016, Busch called defendant, and he visited her. She gave him money to purchase drugs. They consumed drugs and had sex.

¶ 14 On June 11, 2016, Busch called defendant and asked him to come over. He did so after she called several more times. When defendant entered her apartment, he left his bike in her hallway entrance and observed that she was angry about something. Defendant ate while Busch changed clothes and used crack cocaine. He also smoked marijuana. Busch then asked him to get her "some crack rock" from Howard Street. Defendant refused because they are "gangbanging up there." She told him she would not have sex with him if he did not get the drugs. As he went to leave the apartment, Busch punched him in the mouth. He explained that Busch had a knife in her hands and "was swinging wild[ly]" at him. Defendant, who received several cuts, grabbed her, threw her on the bed, and ran to the door. Before he reached the front door, Busch caught up to him, and he hit her in the eye. He testified that he hit her in self-defense, as he raised his arms to block her from stabbing him. Busch slipped, and defendant grabbed his bike and attempted to leave. He also fell, and the bike fell on top of him. Busch

_____
[1]The record does not show Officer Dinkha's first name.

got up and ran toward him but slipped again and hit her mouth and jaw on the bike. Busch got up, and defendant grabbed his bike and fled into the hallway. Busch chased after him with the knife.

¶ 15    When defendant reached the downstairs lobby, he called police, who told him to wait there. Defendant left because there were a "lot of gangbangers" in the area. He went to his sister's home, who helped treat his hand. After defendant received a call from dispatch, he approached the police.

¶ 16    On cross-examination, defendant identified photographs of his hands and face taken on June 11, 2016. Defendant said that the photographs of his hands showed cuts.

¶ 17    Tiffany Gue, defendant's sister, testified that defendant came to her home on June 11, 2016, between 5 p.m. and 6 p.m. with cuts on his hand. He stayed at her house for approximately an hour before leaving.

¶ 18    The defense published a 30-second video of Busch's interview with an assistant state's attorney and a Chicago police officer. In the video, Busch described her relationship with defendant as, "just strictly bed partners." She explained that "bed partners" meant that they "only have sex, and he comes over to my house and we smoke blunts and he goes to bed with me, wakes up, leaves." She was asked if she had a "physical relationship" with defendant, and she answered, "nothing else about him. [pause where one of questioners begins speaking] That he beats women that's all I know about him."

¶ 19    In rebuttal, the State admitted the photographs of defendant's hands and face used during their cross-examination of defendant.

¶ 20    Prior to deliberations, the jury was instructed that to find defendant guilty of domestic battery they had to find "[t]hat Teryl Busch was a family or household member to the defendant" and that "[t]he phrase 'family or household member' means persons who have or have had a dating or engagement relationship." See Illinois Pattern Jury Instructions, Criminal, Nos. 11.12, 11.11A (4th ed. 2000).

¶ 21    During deliberations, the jury sent a note to the court asking, "[w]ill you please give us more clarification on what the law says a relationship is." Defense counsel, relying on *People v. Gray*, 2016 IL App (1st) 134012, *rev'd*, 2017 IL 120958, asked the court to instruct the jury that a relationship required a romantic component. The State's position was that the jury had the Illinois Pattern Jury Instruction for what a family or household member is: those who have or have had a dating relationship. The court denied counsel's request, finding that a jury would be able to discern what a dating relationship was. Specifically, the court stated it was not going to give the instruction because:

> "whether or not it has the normal meaning of something cannot be discerned by the jury in this matter; and, *** I can't give an instruction—a non-I.P.I. instruction or an answer that's going to push the jury one way or another. This is a factual determination for them to determine. I'm not going to give any non-I.P.I. in this."

The court stated it would instruct the jury that: "You have the evidence. You have the law. Continue to deliberate." Defendant stated that for the record it was requesting that the jury be instructed that: "A dating relationship is required to have a romantic focus. A dating relationship refers to a serious courtship." The court sent its answer to the jury to continue to deliberate.

¶ 22 The jury returned a not guilty verdict on both counts of aggravated domestic battery and guilty on domestic battery.

¶ 23 Prior to sentencing, defendant filed a motion for judgment notwithstanding the verdict or in the alternative motion for a new trial. Defendant argued that there was insufficient evidence of a dating relationship to establish the required element for domestic battery. He also argued that the court erred when it did not provide an instruction to the jury. The court denied the motion. After a hearing, the court sentenced defendant to 2½ years' imprisonment for domestic battery.

¶ 24 III. ANALYSIS

¶ 25 On appeal, defendant argues that the State did not prove beyond a reasonable doubt that Busch satisfied the statutory definition of "family or household member" because they were not in a "dating relationship." Specifically, he maintains that he and Busch were not dating but, rather, "bed buddies" whose relationship was limited to sex and drug use.

¶ 26 On a challenge to the sufficiency of the evidence, a reviewing court will look at "the evidence in the light most favorable to the State" and determine if "any rational trier of fact could have found the required elements beyond a reasonable doubt." *People v. Newton*, 2018 IL 122958, ¶ 24. It is not the reviewing court's responsibility to retry the defendant. *Id.*; *People v. Smith*, 185 Ill. 2d 532, 541 (1999). This court may not substitute its conclusions for that of the trier of fact on the issue of credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. Yet, these judgments by the trier of fact are not conclusive. *Id.* We will overrule a factual determination when "the evidence is so unreasonable, improbable, or unsatisfactory" that guilt is not proven beyond a reasonable doubt. *Newton*, 2018 IL 122958, ¶ 24.

¶ 27 In this case, defendant was found guilty of domestic battery. A defendant is guilty of domestic battery if he "[c]auses bodily harm to any family or household member." 720 ILCS 5/12-3.2(a)(1) (West 2016). The statutory definition of "[f]amily or household members" includes "persons who have or have had a dating or engagement relationship" but does not include "a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts." *Id.* § 12-0.1. We have considered a dating relationship to be a " ' "serious courtship" ' " that at least needs to be " 'an established relationship with a significant romantic focus.' " *People v. Irvine*, 379 Ill. App. 3d 116, 125 (2008) (quoting *People v. Young*, 362 Ill. App. 3d 843, 851 (2005)). A trier of fact must find each element of domestic battery beyond a reasonable doubt. See *id.* at 122.

¶ 28 After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found the required elements beyond a reasonable doubt. *Newton*, 2018 IL 122958, ¶ 24. The record shows that Busch testified that she had been dating defendant for six to eight months and knew him for several more years. The two spoke daily. She explained that the two spent time going shopping, and she spent money from her welfare check on candy and other items for defendant. She believed he was her boyfriend because "he enjoyed being with" her, permitted her to groom him, kept her company, helped her, and "was loving." Given this record, the trier of fact could reasonably infer that defendant and Busch were in a dating relationship. Stated differently, the evidence is not so unreasonable, improbable, or unsatisfactory that guilt is not proven beyond a reasonable doubt. *Id.*

¶ 29 In reaching this conclusion, we are not persuaded by defendant's reliance on *People v. Howard*, 2012 IL App (3d) 100925. In *Howard*, both the defendant and victim testified that

they were not dating. *Id.* ¶ 5. The "defendant and the victim engaged in random sexual encounters which were physical in nature, not romantic." *Id.* ¶ 10. Here, unlike in *Howard*, Busch testified that she had been dating defendant.

¶ 30 Although defendant denied that he dated Busch and sought to impeach her testimony with her prior statement that they were strictly bed partners, it was for the trier of fact to resolve conflicts in the evidence. See *Brown*, 2013 IL 114196, ¶ 48 (this court will not substitute its judgment for the trier of fact on credibility determinations). Impeachment is a challenge to the credibility of the witness, and "[u]ltimately, it falls to the trier of fact to determine whether that challenge was successful, something we cannot determine on review." *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47. Given the verdict, the jury resolved this inconsistency in favor of the State. As such, defendant essentially asks this court to overturn the jury's determination regarding the credibility of a witness, which we will not do. *Brown*, 2013 IL 114196, ¶ 48. As mentioned, Busch testified that she was dating defendant and provided details to establish their relationship. The jury was in the best position to determine the credibility of the witnesses. See *id.* The jury's decision to find Busch's testimony at trial credible was not so unreasonable as to require this court to overturn the judgment.

¶ 31 Defendant next contends the trial court abused its discretion when it did not provide a jury instruction in response to the jury note asking for "more clarification on what the law says a relationship is." Defense counsel asked for a non-Illinois Pattern Jury Instruction stating "[a] dating relationship is required to have a romantic focus. A dating relationship refers to a serious courtship." The court refused over defendant's objection and instead instructed the jury, "[y]ou have heard the evidence. You have the instructions of law. Please continue to deliberate."

¶ 32 A trial court's decision not to answer a jury question will not be overturned without an abuse of discretion. *People v. Manning*, 334 Ill. App. 3d 882, 890 (2002). When the jury poses a legal question to the trial court, it is entitled to have the question answered. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). A general rule is that the "court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *People v. Averett*, 237 Ill. 2d 1, 24 (2010). "When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *People v. Childs*, 159 Ill. 2d 217, 229 (1994).

¶ 33 However, the court can decline to answer a jury question under appropriate circumstances. *People v. Millsap*, 189 Ill. 2d 155, 161 (2000). The court may refuse to answer a jury's question if it is presented with the following scenarios:

> "when the jury instructions are readily understandable and sufficiently explain the relevant law, when additional instructions would serve no useful purpose or may potentially mislead the jury, when the jury's request involves a question of fact, or when giving an answer would cause the trial court to express an opinion likely directing a verdict one way or the other." *Averett*, 237 Ill. 2d at 24.

Furthermore, where there is "a commonly understood meaning" to the words of the instructions, the court does not need to define them with additional instructions, particularly when there is no pattern jury instruction for additional definition. *Manning*, 334 Ill. App. 3d at 890; accord *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 42.

¶ 34 Here, we find the trial court did not abuse its discretion when it refused to provide the jury with a nonpattern instruction in response to the jury note for "more clarification on what the law says a relationship is." The record shows the jury instructions were readily understandable

and sufficiently explained the relevant case law. The word "relationship" has a commonly understood meaning and does not require further explanation. See *Manning*, 334 Ill. App. 3d at 890 (where there is "a commonly understood meaning" to the words of the instructions, the court does not need to define them with additional instructions). Indeed, the jury's question does not indicate any confusion over a common meaning of the word, just the desire to know more about the surrounding law.

¶ 35    The court properly instructed the jury: "You have the evidence. You have the law. Continue to deliberate." In doing so, the court noted that ultimately the jury must make the factual determination if there was a relationship and it was possible that an additional instruction could tilt the verdict one way or another. Moreover, defendant's suggestion could spur more legal confusion by the jury about what the law deems to be a "romantic focus" and a "serious courtship." See *Averett*, 237 Ill. 2d at 24 (a court may refuse to answer a jury's question when additional instructions could potentially mislead the jury). After the jury sent the note, less than an hour and a half went by before the jury returned its verdict. During this time, the jury did not ask any follow-up questions, which could indicate confusion. See *People v. Brouder*, 168 Ill. App. 3d 938, 946-47 (1988) (jury twice asked for judge on clarification of a phrase). In sum, the court did not abuse its discretion in refusing to provide the nonpattern jury instruction requested by defendant.

¶ 36                                    IV. CONCLUSION
¶ 37    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 38    Affirmed.