2023 IL App (1st) 220465

SIXTH DIVISION
December 22, 2023 Filing Date

Nos. 1-22-0465 & 1-22-0755 (cons.)

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| KEITH MCCLELLAN, | ) | |
| | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | Nos. 22 OP 60096 |
| BRIANNA HULL, | ) | 22 OP 60583 |
| | ) | |
| Respondent-Appellant. | ) | The Honorable |
| | ) | Debra A. Seaton, |
| | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.

Justices  Hyman & C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent Brianna Hull appeals the entry of both, an emergency order of protection (EOP) and plenary order of protection (POP), that were entered against her by the circuit court of Cook County in favor of petitioner Keith McClellan. She also appeals the denial of her petition for a civil no contact order (CNCO) against McClellan. Hull raises multiple issues on appeal related to the aforementioned orders: (1) the circuit court erred in finding that she

did not prove non-consensual sexual penetration, which forecloses McClellan's claim of harassment and requires granting of Hull's CNCO petition; (2) because the circuit court acknowledged that it could be true that McClellan sexually assaulted Hull, the court necessarily erred in finding Hull's statements constituted harassment even if Hull did not prove it occurred; (3) the circuit court erred in finding that Hull harassed McClellan solely based on defamation because McClellan failed to prove that Hull made false statements; (4) the circuit court erred in issuing the emergency order of protection (EOP) and the OP because the parties lacked the requisite relationship required by the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2022)); (5) the circuit court abused its discretion by improperly excluding relevant testimony and evidence; (6) the circuit court failed to make the requisite findings before issuing the OP; (7) the OP includes an unconstitutional prior restraint on Hull's free speech; and (8) the circuit court erred in denying Hull's CNCO petition and, in the alternative, Hull is entitled to a new hearing on her petition.

¶ 2        On October 25, 2022, this court granted leave for the filing of an *amicus curiae* brief in support of Hull's appeal by the following organizations: The Network: Advocating Against Domestic Violence; the Chicago Alliance Against Sexual Exploitation (CAASE); the Illinois Coalition Against Domestic Violence (ICADV); the Illinois Coalition Against Sexual Assault (ICASA); Land of Lincoln Legal Aid; Legal Aid Society of Metropolitan Family Services (LAS); Life Span; Mujeres Latinas en Accion (Mujeres); the National Crime Victim Law Institute (NCVLI); Prairie State Legal Services, Inc. (PSLS); Resilience; and The Shriner Center on Poverty Law; collectively referred to as the *amici*. In their brief, the *amici* contend that: (1) sharing experience is fundamental to the healing process for survivors of sexual violence; (2) social media is an especially essential platform for survivors of sexual violence

like Hull; and (3) prohibiting survivors from sharing their experience subverts the Domestic Violence Act and harms the very people it was passed to protect.

¶ 3 For the following reasons we reverse the order of protection against Hull and affirm the denial of Hull's petition for a CNCO.

¶ 4 I. BACKGROUND

¶ 5 The background for this appeal comes from the appellate record filed with this court. Because we believe the question of whether Hull was a family or household member is dispositive of the issues raised in this appeal relative to the circuit court's grant of McClellan's OPs, we confine our recitation of the background to those relevant facts. We will recite any additional facts related to the denial of Hull's CNCO as needed.

¶ 6 A. Petition for Emergency Order of Protection

¶ 7 The record reveals that McClellan filed a *pro se*, self-verified petition for an emergency order of protection (EOP) pursuant to the Domestic Violence Act (750 ILCS 60/102 *et seq.* (West 2020)) on April 23, 2021, against Hull.

¶ 8 In the petition, McClellan alleged that the parties have or had a "dating or engagement relationship"; McClellan was "fearful of further abuse"; and, there was a "history of abuse."[1] The petition sought an order of protection (OP) preventing Hull from committing physical abuse, harassment, interference with personal liberty and stalking. The petition also sought exclusive possession of the residence at 12412 South Justine in Calumet Park and exclusive possession of a 2019 Jeep Wrangler.

---

[1] These allegations were selected by checking the applicable boxes on a State approved preprinted form.

¶ 9        McClellan included a summary of the incident(s) comprising the abuse as follows:

"On March 19, 2021[,] I and Brianna Hull met for the first time in person, before this day weeks before our first date we have talked and facetime each other several times that is when we became friends. On March 17th she arrived home from school[,] we've discussed that we will be meeting soon. On Friday[,] March 20, 2021[,] she invited me back out visit her before she leaves to return to school. During that time[,] we went out for smoothies, smoked, and set [*sic*] in my vehicle at my home. We both decieded [*sic*] to have consensual sex. After this date we haven't been talking with each other with her going to school, and [*sic*] me myself having both of my grandparents passing away 2 weeks apart. All of a sudden on April 16, 2021[,] I received phone calls and text messages to look on her twitter accout [*sic*]. Brianna Hull posted on twitter that she was raped by me, that I'm a predator that she wants justice for herself and she wants to warn everybody about me of a sick nature.

After this post on twitter I have been recieving [*sic*] unknown phone calls, unknown cars have been following me from home to work, and work to home. This was one of the primary reason I will need this order of protection because my life has been threatened with physical and psychological abuse. Myself and my family is feeling fear and anxiety from Brianna Hull constantly placing libel statement on her twitter which is false and defamatory statement about my character. I have nude pictures and text messages that she has been wanting to get with me now all of a sudden she wants to say I have raped her because I honestly told her I have a lady friend here which I've been knowing for a full year."

¶ 10       At the *ex parte* hearing on his EOP petition which was held the same day the petition was filed, McClellan testified that Hull was a young lady he was dating for a "couple of weeks,

talking as friends" since approximately March 1, 2021. When the circuit court asked whether he considered the relationship to be boyfriend and girlfriend, McClellan replied no, they met in person for the first time on March 19, 2021, and stated that they had consensual sex. McClellan further stated that they met in person for the second time on March 20, 2021, when they went out for smoothies and smoked cannabis before deciding to have sex. He also indicated that they talked after that and all of a sudden, on April 16, 2021, he received a phone call and text messages to look on Hull's Twitter account where she posted messages that she was raped by him, he was a predator, she wanted justice for herself and sought to warn others of his sick nature. McClellan stated that she posted a photo of him and his name online and that he thought she filed a police report against him. With respect to the unknown cars, McClellan stated that he did not see her in any of the cars and had no reason to believe that she was in any of those cars. McClellan did not testify about any history of abuse or provide any testimony of threats by Hull as noted in his petition. The circuit court inquired whether Hull had filed a police report and McClellan indicated that he thought she had.

¶ 11    The circuit court found that under the Domestic Violence Act, after taking into consideration the verified petition and McClellan's testimony, there were sufficient averments of abuse and granted the EOP. The court noted that it was subject to any type of criminal charges being filed against McClellan or any other limiting status by the State's Attorney's office.

¶ 12    McClellan was granted an *ex parte* EOP on the same date it was filed and it was in effect until a hearing date of May 13, 2021. The *ex parte* EOP provided that McClellan had exclusive possession of the Calumet Park residence and the 2019 Jeep, and ordered Hull to have no contact by any means with McClellan.

¶ 13    The record does not indicate that Hull was served with McClellan's petition for an EOP. The sheriff's affidavit of service indicated that service was unsuccessfully attempted on April 24, 28 and May 3, 2021, at an address in Homewood, Illinois.[2]

¶ 14    B. Hull's Appearance and Motions to Vacate the EOP and Dismiss the Petition

¶ 15    The record does not indicate how Hull learned of the hearings, but the order entered on May 12, 2021, indicated that the hearing was continued to June 2, 2021, to allow Hull time to retain an attorney. Hull, subsequently filed her appearance through counsel from Legal Aid Chicago on June 1, 2021. Hull's counsel then filed combined motions to vacate the EOP and dismiss the petition for OP. The motion indicated that the parties met through social media in March 2021 and met in person to hang out on March 16, 2021, with no sexual behavior. The motion further stated that McClellan "pestered" Hull to meet again in person, which occurred on March 19, 2021, at which time Hull told him that she was not interested in any sexual contact. The motion alleged that despite Hull's refusal, McClellan had vaginal sexual contact with her. On March 21, 2021, Hull went to the hospital, obtained a rape kit and reported the contact to the local police. On April 16, 2021, Hull posted on Twitter an allegedly factual statement that McClellan had raped her; there were no threats, explicit or implied in the statement. Hull did not receive prior notice of McClellan's April 23, 2021, EOP hearing and therefore did not know or appear in court for the hearing. The motion alleged that McClellan's petition provided no dates or details for the alleged incidents of unknown phone calls or unknown cars following him such as dates, contents of the calls, identification of the callers or the cars' appearance. Nor did McClellan provide any proof that the alleged calls or cars

_____

[2] Hull is a college student in Charleston, Illinois and was on campus during the various service attempts at what was presumably her local address.

following him were Hull or her associates. The motion also attacked McClellan's petition's reference to nude photos of Hull, stating that showing the photos in court could constitute the felony of non-consensual dissemination of private sexual images (720 ILCS 5/11-23.5) as showing such photographs had nothing to do with whether Hull consented to sex. In May 2021, Hull deleted the Twitter post about McClellan. The motion further stated that Hull had been in school at Eastern Illinois University between March 22, 2021, and May 7, 2021, which was two-and-one-half hours from Calumet Park, Illinois.

¶ 16    In seeking to vacate the EOP, Hull argued that she did not receive the two-day notice required under the Domestic Violence Act, the parties did not have a dating relationship and McClellan failed to allege anything that would constitute abuse under the Domestic Violence Act. Hull argued that McClellan's petition falsely stated that they were in a dating relationship; they met through social media in March 2021 and only met twice in person over a few days. Hull further argued that posting on Twitter about a personal experience of sexual assault is not harassment of the "rapist" and warning acquaintances about an alleged sexual predator is not unreasonable. Additionally, the motion argued that even if the court found that Hull was untruthful about the sexual assault, the more appropriate forum was for McClellan to file a defamation suit and not in seeking protection under the Domestic Violence Act. Hull also contended that there was no reason for McClellan to proceed *ex parte* without giving her proper notice under the Domestic Violence Act.

¶ 17    Hull also argued that McClellan's petition should be dismissed because her Twitter post was truthful and further that she was in Charleston from March 22, 2021, until May 7, 2021, and thus could not have followed McClellan in a car. Hull attached an affidavit to the motion

in which she averred to the claims made in her motion. Hull's motion to dismiss was denied without prejudice on July 9, 2021.

¶ 18                                    C. Rehearing on McClellan's EOP Petition

¶ 19          The EOP petition was subsequently set for rehearing on July 12, 2021, and the hearing began on that date via the Zoom videoconferencing platform. McClellan had retained counsel by this time. The EOP was then extended multiple times throughout 2021 as the hearing took place over several months.

¶ 20                                    1. McClellan's Testimony

¶ 21          McClellan testified that he was 24 years old, resided in Calumet Park, Illinois and that he knew Hull. He stated that he first started speaking to Hull around March 1 or 2, 2021, and identified her on the screen. McClellan stated that he and Hull texted between March 5 and March 20, 2021, and met her in person twice. He testified that he met her on March 19 and 20, 2021, in person. McClellan stated that the conversations with Hull were very friendly conversations. He further testified that they had two in-person dates: on March 19, 2021, they went to a park and an ice cream shop; and, on March 20, 2021, they got some smoothies and he took her to his house. He then stated that he filed his petition for an OP because she posted things on the Twitter and he felt very harassed by them. McClellan stated that Hull made one post on April 16, 2021, then additional posts on other days. McClellan testified that he had a twitter account but did not state how he first learned of the Tweets.

¶ 22          At the next hearing date, it was clarified that the dates McClellan and Hull met were actually March 16 and 19, 2021. McClellan testified that on March 16, 2021, he picked Hull up from an address in Homewood, they went to get smoothies, and went back to his house where they sat in his car. He further testified that Hull asked to see him again which is why he

picked her up again. McClellan stated that they kissed, engaged in oral sex and had consensual sex. At the close of the August 20, 2021, court date, the circuit court found standing for a dating relationship between the parties.

¶ 23                                2. Stipulations

¶ 24        The parties entered an agreed stipulation on July 23, 2021, to the following:

"1. The parties first met through Facebook in early March 2021.

2. From March 5- March 20, 2021, the parties communicated.

3. The parties met two times in person- first on March 16, 2021, and next on March 19, 2021.

4. The parties stipulate to the authenticity of [McClellan]'s exhibits attached hereto as Exhibit A.

5. The parties stipulate to the authenticity of [Hull]'s exhibits attached hereto as Exhibit B.

6. According to the Cook County Sheriff Process Server, on May 5, 2021, the Cook County Sheriff attempted to serve [Hull] in this case was but was unable to serve her on that day."

¶ 25        McClellan's Exhibit A was a printout of the tweets previously tendered and included one where Hull stated that many people did not want her to speak about the incident "because of fear and retaliation." It should be noted that the tweets named "Keith Brian McClennan."[3] Exhibit B was a printout of text messages between Hull and "Keith Brian McClennan" presumably dating from March 19 and 20, 2021.

¶ 26                               3. Hull's Testimony

---

[3] We will presume that "Keith Brian McClennan" and McClellan refer to the petitioner.

¶ 27        Hull testified that she and McClellan met when he messaged her on Facebook on March 3, 2021, and they continued chatting via Snapchat and subsequently via text messages and phone calls on March 6, 2021. She stated that they met in person on March 16, 2021, when they went to a park and smoked. Hull testified that they did not kiss, there was no sexual contact between the parties and they were not out very long. She met with McClellan because he said he was going through some things and needed to talk. Specifically, Hull stated that McClellan was in distress over a previous physical assault wherein he was the victim, his mother's health condition, and the recent loss of his brother. Hull also testified that although she previously considered McClellan as a romantic interest, she no longer did after they met in person because they had no chemistry and just "differences in certain things."

¶ 28        Hull stated that she did not want to see McClellan again, but did because he kept asking her and said he wanted to apologize for their earlier arguments, so she relented. After McClellan picked her up, they went through the drive-through of a nearby Taco Bell before going to park behind McClellan's home in Calumet Park. Hull testified that they kissed that night and she consented to kissing McClellan. She also stated that she consented that McClellan could perform oral sex on her ultimately but did not consent to vaginal sex, and she conveyed her lack of consent to him. According to Hull, McClellan said that he would not wait until she got back to campus because she would be too loud and also said that she "was going to feel his d*ck tonight" and inserted his penis into her vagina. Hull testified that she told McClellan that she did not want to have penetrative sex and pushed him off of her by pushing on his chest.

¶ 29        At the next hearing date, the circuit court stated that it was not relevant whether there was a sexual assault; under the statute, it had to decide the relationship between the parties and

whether Hull's social media messages were defamatory. The circuit court allowed Hull to testify that she went to the hospital the following day and a rape kit was done. Hull also testified that she made a police report. The previously stipulated text messages between the parties that took place after the sexual conduct occurred were admitted into evidence, Hull's counsel was allowed to publish them, and Hull read the messages into the record. A relevant excerpt from the messages on March 20, 2021, after Hull was dropped off at home, follows:

"[HULL] Yeen even have to do allat last night

That was shiesty asf

[MCCLENNAN] Apologized

[HULL] aPoLogIzEd

N*iggas wtf? You were born of a F*cking woman you have f*cking sisters

You could've waited

But YOU just had to have your way w me

You know that sh*t is not justifiable! I dare you to try and explain that sh*t. But that's between you and god n*gga

[MCCLELLAN] I'm not gonna go through this I told you

My brother just died an you got to whole p*ssy in my face wtf you tweaking just chill

[HULL] Everybody deal with loss n*gga! That don't mean you can't keep your d*ck to yourself

[MCCLELLAN] I

[HULL] I told you several times I wasn't tryna have sex

[MCCLELLAN] K

[HULL] I told you several times no

I told you several times stop

[MCCLELLAN] Now you want talk but couldn't talk lastnight it's a new day don't do this

\*\*\*

[HULL] Pain supposed to humanize you! You not supposed to violate people because you're hurting! Now wtf you done! For a few moments of getting yo d\*ck wet

[MCCLELLAN] I'm not tho but you show couldn't talk yesterday

What you wanna do

[HULL] I couldn't talk bc I was tryna not to throaw up in your f\*ckin vehicle bc of how physically sick you mentally sick a\*\* made me feel by doing that bullsh\*t

I should've just grabbed the wheel and took both our a\*\* outta here and expedite your f\*cking trip straight to hell

[MCCLELLAN] You ain't crazy

[HULL] B\*tch F\*CK YOU! You're the one who is crazy! There's no doubt in my f\*cking mind that you do this on a normal basis! You Buford a\*\* sick a\*\* delusional a\*\* n\*gga! God gone get you're a\*\* right!

[MCCLELLAN] God Got me..

I ain't worried."

¶ 30    Hull went on to testify that she did not talk to McClellan after that because she had "no interest in engaging with a man who sexually assaulted [her]. There would not be any productive conversation to be had." When asked why she posted the Tweets between April 16 and 25, 2021, Hull stated that it was sexual assault awareness month; however, the circuit court

refused to take judicial notice that April is sexual assault awareness month. Hull further testified that she and McClellan were not connected on Twitter and she did not intend for him to see the Tweets; they were directed to other women who were sharing their experiences with the Me Too movement. Hull stated that she later removed the Tweets because she did not intend anything other than to bring awareness during that time and did not want to be subject to more attention and scrutiny for something she no longer wanted to think about. She testified that her Twitter posts were not public. Hull further testified that she did not follow McClellan in a car or direct anyone to do so, had not spoken with him since March 19, 2021, and did not direct anyone else to call him.

¶ 31   On cross-examination, Hull testified that she sent nude or partially nude photos to McClellan; when her counsel objected, the circuit court stated that sending of the photos would be relevant for determining whether the parties were in a dating relationship.

¶ 32                     4. The Circuit Court's Findings

¶ 33   On December 20, 2021, the circuit court found that McClellan's allegations regarding abuse fell under the harassment prong of the Domestic Violence Act for defamation based on the accusations of rape in a social media post. The court found that the allegations regarding being followed in a car was not proven. The court found that, with respect to a dating relationship, that a "social relationship developed on a social media platform for a few weeks for the express purpose of two people getting together for the purpose of meeting one another and going out on a date." The court also found that the date occurred and then another date was set where the disputed sex took place. The court found that, from McClellan's perspective, the meetings were an attempt at a relationship, and that Hull's behavior showed more than a casual interest in McClellan, but a minimal interest in the person. The court found it unreasonable

that a person who was not romantically interested in another person would go out with a person, kiss them, get undressed and get into the back of a car with them. The court concluded that the evidence showed an "attempt to start a dating relationship" and that McClellan met his burden to show that a dating relationship existed although it was at the beginning. The court found that Hull's act of sending nude photos to McClellan and the consensual sex acts show the context of the parties' relationship.

¶ 34       With respect to abuse, the court found that Hull's posting of social media posts were defamatory and constituted harassment of McClellan under the Domestic Violence Act. The court found that the text messages from March 20, 2021, did not mention the word "rape" and did not indicate that a sexual assault took place. The court then stated that both parties were prohibited from posting about each other or the case on social media, and noted that there was a criminal case pending. The court then amended the EOP to include the prohibition.

¶ 35       The matter was continued for a hearing on the plenary OP. McClellan adopted the evidence that was presented at the EOP rehearing. Hull briefly testified that she went to the hospital and that a rape kit was done. She also spoke with police while at the hospital.

¶ 36       The circuit court granted McClellan's petition for an OP on March 4, 2022, and entered a plenary OP against Hull for two years. Its findings were consistent with those made at the rehearing on McClellan's EOP petition. Hull filed her notice of appeal from the grant of McClellan's OP on April 1, 2022 (1-22-0465).

¶ 37              5. Hull's Petition for a Civil No Contact Order (CNCO)

¶ 38       Hull's CNCO petition was filed on January 12, 2022, and raised statutory allegations that McClellan engaged in non-consensual sexual penetration with her. The hearing on her petition was held on April 29, 2022.

- 14 -

¶ 39 At the hearing on Hull's petition, the parties agreed to use the evidence presented during the OP hearing and both parties' counsel presented argument. The circuit court found that Hull's testimony was full of contradictions and that it was clear from the testimony presented by both parties that the parties engaged in consensual contact of kissing, removal of Hull's clothes and oral sex. The court further found that based on the testimony presented, when Hull pushed McClellan away during vaginal sex, he stopped, they got dressed and McClellan took Hull home. The court considered evidence presented by Hull that she did not like McClellan yet met up with him twice. The court concluded that it did not know what occurred in the car but found that Hull's credibility was at issue and it was not clear by a preponderance of the evidence that non-consensual sex occurred. Hull's petition was denied and she filed her timely notice of appeal on May 27, 2022 (1-22-0755). The appeals were consolidated on June 21, 2022.

¶ 40                                    II. ANALYSIS

¶ 41 Hull contends on appeal that: (1) the circuit court erred in finding that she did not prove non-consensual sexual penetration, which forecloses McClellan's claim of harassment by defamation and requires the grant of Hull's CNCO petition; (2) because the circuit court acknowledged that it could be true that McClellan sexually assaulted Hull, the court necessarily erred in finding Hull's statements constituted harassment; (3) the circuit court erred in finding that Hull harassed McClellan solely based on defamation because McClellan failed to prove that Hull made false statements; (4) the circuit court erred in issuing the EOP and the OP because the parties lacked the requisite relationship required by the Act; (5) the circuit court abused its discretion by improperly excluding relevant testimony and evidence; (6) the circuit court failed to make the requisite findings before issuing the OP; (7) the OP includes an

unconstitutional prior restraint on Hull's free speech; and (8) the circuit court erred in denying Hull's CNCO petition and, in the alternative, Hull is entitled to a new hearing on her petition. Essentially, Hull asks this court to review the grant of both the EOP and OP in McClellan's favor, and the denial of her petition for a CNCO.

¶ 42                                         A. Lack of Appellee Brief

¶ 43        On November 30, 2022, this court granted McClellan's *pro se* motion for extension of time to file his appellee brief.  Nevertheless, McClellan did not file a brief and consequently on March 7, 2023, this court entered an order taking the case on the record and the appellant's brief only. McClellan then filed a *pro se* motion for leave to file a settlement, which appeared to allege that the appeal should be dismissed because there was a settlement offer. That motion was stricken by this court for lack of clarity on March 28, 2023.[4] A reviewing court is not compelled to serve as an advocate for the appellee and is not required to search the record for the purpose of sustaining the trial court's judgment. *Benjamin v. McKinnon*, 379 Ill. App. 3d 1013, 1019 (2008). However, if the record is simple and the claimed errors are such that the reviewing court can easily decide them without the aid of an appellee's brief, that court should decide them without the aid of an appellee's brief, that court should decide the merits of the appeal. *Id.*

¶ 44        Because a primary issue in this appeal is whether the record supports the trial court's finding that McClellan proved by a preponderance of the evidence that he was abused, we

_____

[4] This court's order stated that McClellan's motion was unclear but gave him leave to file a new motion that clearly stated the relief being sought; additionally, if the case had settled, he should advise this court and the parties of record. McClellan did not file any further documents with this court; and upon further inquiry, Hull's counsel indicated that this case had not settled contrary to McClellan's assertions in his motion.

conclude that we can easily determine the merits of this appeal without an appellee's brief. We will therefore consider the appeal on the record and appellant's brief only pursuant to the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33 (1976).

¶ 45          B. Statutory Framework Surrounding Domestic Violence Orders of Protections

¶ 46          We begin our discussion by setting forth the applicable statutory framework in the Domestic Violence Act relevant to orders of protection.

¶ 47          The Domestic Violence Act is to be "construed liberally to promote its purposes, which are to:

(1) Recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development;

(2) Recognize domestic violence against high risk adults with disabilities, who are particularly vulnerable due to impairments in ability to seek or obtain protection, as a serious problem which takes on many forms, including physical abuse, sexual abuse, neglect, and exploitation, and facilitate accessibility of remedies under the Act in order to provide immediate and effective assistance and protection.

(3) Recognize that the legal system has ineffectively dealt with family violence in the past, allowing abusers to escape effective prosecution or financial liability,  and has not adequately acknowledged the criminal nature of domestic violence; that, although many laws have changed, in practice there is still widespread failure to appropriately

protect and assist victims;

(4) Support the efforts of victims of domestic violence to avoid further abuse by promptly entering and diligently enforcing court orders which prohibit abuse and, when necessary, reduce the abuser's access to the victim and address any related issues of child custody and economic support, so that the victims are not trapped in abusive situations by fear of retaliation, loss of a child, financial dependence, or loss of accessible housing or services;

(5) Clarify the responsibilities and support the efforts of law enforcement to provide immediate, effective assistance and protection for victims of domestic violence, recognizing that law enforcement officers often become the secondary victims of domestic violence, as evidenced by the high rates of police injuries and deaths that occur in response to domestic violence calls; and

(6) Expand the civil and criminal remedies for victims of domestic violence; including, when necessary, the remedies which effect physical separation of the parties to prevent further abuse." 750 ILCS 60/102 (West 2020).

¶ 48 Section 203 of the Domestic Violence Act provides that a petition for an OP shall be in writing and verified or accompanied by affidavit and shall allege that petitioner has been abused by respondent, who is a family or household member. 750 ILCS 60/203(a) (West 2020).

¶ 49 Section 214(a) of the Domestic Violence Act provides that an order of protection may be issued if the court feels that petitioner has been abused by a family or household member, or that petitioner is a high-risk adult who has been abused, neglected or exploited as defined in the Act. 750 ILCS 60/214(a) (West 2022). Abuse is defined as physical abuse, harassment,

intimidation of a dependent, interference with personal liberty or willful deprivation. 750 ILCS 60/103(1) (West 2022).

¶ 50    Family or household members include spouses, former spouses, parents, children, stepchildren and other persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, persons who share or allegedly share a blood relationship through a child, persons who have or have had a dating relationship, persons with disabilities and their personal assistants, and caregivers as defined in Section 12-4.4a of the Criminal Code of 2012. 750 ILCS 60/103(6) (West 2022). For purposes of that paragraph, neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship. *Id.*

¶ 51    Harassment is defined as knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner. 750 ILCS 60/103(7) (West 2022). Unless the presumption is rebutted by a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:

(i)     creating a disturbance at petitioner's place of employment or school;

(ii)    repeatedly telephoning petitioner's place of employment, home or residence;

(iii)    repeatedly following petitioner about in a public place or places;

(iv)    repeatedly keeping petitioner under surveillance by remaining present outside his or her home, school, place of employment, vehicle or other place occupied by petitioner or by peering in petitioner's windows;

(v)     * * *

threatening physical force, confinement or restraint on one or more occasions." 750 ILCS 60/103(7) (West 2022).

¶ 52    Section 214(b) provides the remedies to be included in an OP. Subsection 214(b)(1) prohibits the respondent's harassment, interference with personal liberty, intimidation of a dependent, physical abuse, or willful deprivation, neglect or exploitation or stalking of the petitioner if such abuse, neglect, exploitation or stalking has occurred or otherwise appears likely to occur if not prohibited. 750 ILCS 60/214(b)(1) (West 2020). Subsection 214(b)(2) prohibits the respondent from entering or remaining in any residence, household, or premises of the petitioner, including one owned or leased by respondent if petitioner has a right to occupancy. *Id*. § 214(b)(2). Subsection 214(b)(3) orders the respondent to stay away from petitioner or any other person protected by the order of protection, or prohibit respondent from entering or remaining present at petitioner's school, place of employment, or other specified places at times when petitioner is present, or both, if reasonable. *Id*. § 214(b)(3). Finally, subsection 214(b)(10) grants petitioner exclusive possession of personal property if petitioner, but not respondent owns the property. *Id*. § 214(b)(10).

¶ 53    In determining whether to grant a specific remedy, the court shall consider relevant factors, including but not limited to the following: the nature, frequency, severity, pattern and consequences of the respondent's past abuse of the petitioner and the likelihood of danger of future abuse. 750 ILCS 60/214(c)(1)(i) (West 2020). The court's findings shall be in an official record or in writing and shall at minimum state that the court considered: the applicable relevant factors described in section 214(c)(1) and (2); whether the conduct or actions of the respondent, unless prohibited, would likely cause irreparable harm or continued abuse; and whether it was necessary to grant the requested relief to protect petitioner. *Id.* § 214(c)(3).

¶ 54 When issuing an *ex parte* EOP, the court can alternatively use the following procedure:

"[w]hen a verified petition for an [EOP] in accordance with the requirements of Sections 203 and 217 is presented to the court, the court shall examine petitioner on oath or affirmation. An emergency order of protection shall be issued by the court if it appears from the contents of the petition and the examination of petitioner that the averments are sufficient to indicate abuse by respondent and to support the granting of relief under the issuance of the [EOP]." *Id.* § 214(c)(4).

¶ 55                                C. Standard of Review

¶ 56 The central inquiry in any proceeding to obtain an order of protection is whether the petitioner has been abused. *In re Marriage of Holtorf*, 397 Ill. App. 3d 805, 808 (2010). Proceedings to obtain an order of protection under the Act are civil in nature and governed by the preponderance of the evidence standard. *Id.* A reviewing court will reverse a finding of abuse only if it is against the manifest weight of the evidence. *Id.*

¶ 57                           D. *Ex Parte* Emergency Order of Protection (EOP)

¶ 58 We first examine Hull's challenge to the circuit court's grant of an *ex parte* EOP to McClellan on April 23, 2021. As noted in the background, McClellan initially filed his EOP petition on April 23, 2021, which was granted the same day. That EOP was extended several times throughout the proceedings before being set for rehearing on McClellan's motion in July 2021.

¶ 59 We note, however, that the EOP has since expired and is now moot. We generally do not review moot cases or render advisory opinions. *In re Shelby R.*, 2013 IL 114994, ¶ 15. However, we find that the question of whether McClellan made the necessary showing for an emergency order falls within the public interest exception to the mootness doctrine. See

*Hedrick-Koroll v. Bagley*, 352 Ill. App. 3d 590, 592 (2004); *Creaser v. Creaser*, 342 Ill. App. 3d 215, 219 (2003). That exception allows review of a formally moot question when (1) the moot question is one of public interest, (2) an authoritative determination of the issue is desirable for the guidance of public officers, and (3) the question will likely recur. *Creaser*, 342 Ill. App. 3d at 219. Because the use of emergency orders under the Domestic Violence Act is a widespread and important method of providing legal protection for the victims of domestic violence, we find that Hull's challenge to the issuance of the *ex parte* EOP meets the first and third criteria for the public interest exception to the mootness doctrine. See *id*. Additionally, because the use of *ex parte* proceedings under the Domestic Violence Act makes it "particularly critical that courts be informed of the standards for the granting of emergency orders," we find that the second criterion is met as well. *Id*. Accordingly, we will review the circuit court's entry of the *ex parte* EOP against Hull.

¶ 60      Section 217 of the Domestic Violence Act governs the issuance of EOPs. That section provides that an EOP shall issue if the petitioner satisfies its requirements for one or more of the requested remedies. 750 ILCS 60/217(a) (West 2020). Moreover, "[f]or each remedy requested, the petitioner shall establish that:

     (1) The court has jurisdiction under Section 208;

     (2) The requirements of Section 214 are satisfied; and

     (3) There is good cause to grant the remedy, regardless of prior service of process or of notice upon the respondent, because:

     (i) For the remedies of 'prohibition of abuse' described in Section 214(b)(1), 'stay away order and additional prohibitions' described in Section 214(b)(3), * * * the harm which that remedy is intended to prevent would be likely to occur if the respondent

- 22 -

were given any prior notice, or greater notice than was actually given, of the petitioner's efforts to obtain judicial relief;

(ii) For the remedy of 'grant of exclusive possession of residence' described in Section 214(b)(2), the immediate danger of further abuse of the petitioner by the respondent, if the petitioner chooses or had chosen to remain in the residence or household while the respondent was given any prior notice or greater notice than actually given of the petitioner's efforts to obtain judicial relief, outweighs the hardships to the respondent of an emergency order granting the petitioner exclusive possession of the residence or household. ***;

(iii) For the remedy of 'possession of personal property' described in Section 214(b)(10), improper disposition of the personal property would be likely to occur if the respondent were given any prior notice, or greater notice than was actually given, of the petitioner's efforts to obtain judicial relief, or if the petitioner has an immediate and pressing need for possession of that property." 750 ILCS 60/217(a)(1), (2), (3) (West 2020).

¶ 61    The plain language of the Domestic Violence Act does not require that actual affidavits be attached to the petition. Instead, the Domestic Violence Act requires that the petitioner show good cause to grant the remedy without prior notice to respondent, and the manner in which good cause can be shown is also not specified in the Domestic Violence Act. *Whitten v. Whitten*, 292 Ill. App. 3d 780, 785 (1997). However, a petitioner must provide proof of exigent circumstances that warrant the issuance of an emergency order without prior notice to respondent. *Id.* at 785-86.

¶ 62          Turning to the case at bar, the record reveals that the circuit court invoked the procedures for entering an *ex parte* EOP as found in Section 214(c)(4), which allowed the court to bypass the factual findings "[w]hen a verified petition for an [EOP] in accordance with the requirements of Sections 203 and 217 is presented to the court" and to examine petitioner on oath or affirmation. 750 ILCS 60/214(c)(4) (West 2020). An emergency order of protection shall be issued by the court under that section "if it appears from the contents of the petition and the examination of petitioner that the averments are sufficient to indicate abuse by respondent and to support the granting of relief under the issuance of the [EOP]." *Id.*

¶ 63          We review the circuit court's determination that the contents of the petition and averments by McClellan supported the issuance of the EOP under the manifest weight of the evidence standard. After a careful review of both the petition and McClellan's testimony at the *ex parte* hearing on his petition, we find that the circuit court's decision to grant McClellan an *ex parte* EOP was against the manifest weight of the evidence.

¶ 64          As noted above, in order for the court to hold an *ex parte* hearing on McClellan's petition for an EOP under Section 214(c)(4) of the Domestic Violence Act, the petition must have complied with Sections 203 and 217. Section 203 requires that the petition for an OP shall be in writing and verified or accompanied by affidavit and shall allege that petitioner has been abused by the respondent, who is a family or household member. 750 ILCS 60/203(a) (West 2020). While McClellan's petition on its face sought relief from abuse by a family or household member because he checked the appropriate box, his testimony at the *ex parte* hearing did not support the pleading. As noted above, when parties are not married and do not live together, the petitioner must show a dating relationship in order to seek relief under the Domestic Violence Act. See 750 ILCS 60/103(6) (West 2020). McClellan testified at the *ex parte* hearing

that he was not in a boyfriend-girlfriend relationship with Hull but instead that they first began communicating on March 1, 2021, that they were "dating and talking as friends," and met for the first time in person on March 19, 2021. This testimony corresponded with the summary of the incident attached to the petition, which indicated that the parties initially met and communicated online just over two weeks before meeting for the first time. There was no other evidence presented of the parties' relationship status.

¶ 65    The Domestic Violence Act added the phrase "dating relationship" in 1993, and explains that it does not include a casual acquaintanceship or ordinary fraternization between two individuals in business or social contexts. 750 ILCS 60/103(6) (West 2020); *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 651 (2003). In *Alison C.*, the second district of this court found that one of the purposes of the Domestic Violence Act was to prevent abuse between persons involved in intimate relationships and that the legislature intended for a "dating relationship" to refer to a serious courtship, one that was more serious and intimate than casual. *Alison C.*, 343 Ill. App. 3d at 652-53. The second district further clarified that it was not enough to establish an intimate relationship; there must be a dating relationship. *People v. Young*, 362 Ill. App. 3d 843, 851 (2005). In *People v. Howard*, 2012 IL App (3d) 100925, ¶¶ 9, 10, a domestic battery case, the third district of this court concluded that although the defendant had numerous sexual encounters, it was not enough to show that defendant and the victim had an intimate relationship. The *Howard* court noted a dating relationship means a serious courtship which must be, at minimum, an established relationship with a significant romantic focus. *Id.* ¶ 10. The parties' numerous sexual encounters were an established relationship that was physical in nature but was not a romantic dating relationship. *Id.* The second district of this court further clarified that its definition in *Alison C.* of a dating relationship was to distinguish "serious

courtship" from casual, nascent, or potential relationships. *People v. Allen*, 2020 IL App (2d) 180473, ¶ 20. The court found that a degree of romantic reciprocity should be present and that if one person is merely the object of desire, then even if a social relationship exists between the parties, there is no dating relationship. *Id.* ¶ 22. This district applied the same definition that a dating relationship was a serious courtship that at least needed to be an established relationship with a significant romantic focus. *People v. Wallace*, 2020 IL App (1st) 172388, ¶ 27.

¶ 66 Applying those definitions to the circumstances presented in this case, neither the allegations in the petition nor the testimony at the hearing support an inference that the parties were in a dating relationship by a preponderance of the evidence as required by Section 203. McClellan's petition and his testimony at the initial *ex parte* EOP hearing that he was "dating" Hull, that they were talking as friends beginning on or about March 1, 2021, and met in person for the first time on March 16, 2021, for a date. The second "date" included sexual activity. He also stated that he did not consider them to be boyfriend and girlfriend. This evidence supports an inference of a brief potential relationship that involved going on dates, but not an actual dating relationship as contemplated by the Domestic Violence Act. Thus relief under the Domestic Violence Act was not available to McClellan. Because McClellan failed to satisfy the family or household member requirement at the *ex parte* hearing by a preponderance of the evidence, the EOP petition should have been denied. It was against the manifest weight of the evidence for the circuit court to find that respondent was a family or household member.

¶ 67 We recognize that the definition of a dating relationship has evolved over time and continues to evolve. The trend of not defining a relationship is growing more and more common, and the term "dating" has come to be a catch-all. https://zoosk.com/date-mis/single-

life/dating-meaning-definition-of-dating/. Dating today is most commonly defined as "a stage of romantic relationships in which two individuals engage in an activity together, most often with the intent of evaluating each other's suitability as a partner in future intimate relationship." https://parade.com/living/dating-vs-relationship. Being in a relationship suggests a much deeper level of intimacy and commitment. *Id.* Young people routinely do not consider going on dates with someone to equate being in a relationship with them, no matter the time frame. The determinations of whether parties are in a dating relationship for purposes of the Domestic Violence Act will continue to be decided on a case-by-case basis as each case presents its own set of circumstances, and we will continue to interpret "dating relationship" not to include casual or potential relationships based on the precedent in this State.

¶ 68        Although we have determined that McClellan's failure to establish that Hull was a family or household member is dispositive of whether he was entitled to the *ex parte EOP,* we will briefly touch on the necessity of exigent circumstances of abuse in order to grant EOPs in an *ex parte* hearing, because McClellan also failed to satisfy the requirements of the Domestic Violence Act to establish abuse that required exigent, *ex parte* proceedings under Section 217. His statement of the incident that was included with his petition indicated that there were social media posts made on April 16, 2021, that there were "unknown" cars following him and "unknown" callers calling him. There was no detail provided about the unknown cars or callers, and McClellan stated during his testimony at the hearing that he did not believe that Hull was responsible for the calls or cars, nor was she present in the unknown cars. While McClellan verbally stated what the social media posts said, there were no attachments or other proof to support his allegations presented to the court with his petition or with his testimony.

¶ 69    It should also be noted that the petition for an EOP was filed and the *ex parte* hearing held on April 23, 2021, which was a week after the complained-of social media posts were made. There was no testimony that there were continuous posts or other posts beyond that date at the time the EOP was sought or granted. There were no allegations made of immediate harm or danger to McClellan, either in the petition or during his testimony at the hearing, nor was there any allegation or evidence presented that the abuse would recur if Hull had been given proper notice. In short, there was no evidence of exigent circumstances presented that supported having an *ex parte* hearing or entering an EOP without proper notice to Hull. We therefore conclude that it was against the manifest weight of the evidence for the circuit court to grant McClellan an EOP in an *ex parte* proceeding where McClellan failed to prove exigent circumstances by a preponderance of the evidence.

¶ 70    In sum, because McClellan failed to satisfy the requirements of Sections 203 and 217 by a preponderance of the evidence, he should not have been granted an EOP in an *ex parte* proceeding.

¶ 71    E. EOP Rehearing and Plenary Order of Protection (OP)

¶ 72    We next review whether McClellan's EOP petition should have been granted after the second hearing, and whether the petition for a plenary OP should have been granted. It is worth noting that the improper grant of an EOP on April 23, 2021, led to the EOP being extended for almost a year while proceedings on his petition continued. The EOP was eventually reissued on December 8, 2021, followed by the plenary OP that was entered on March 4, 2022.

¶ 73    As stated above, it is the petitioner's burden to prove the statutory requirements by a preponderance of the evidence. *Sanchez v. Torres*, 2016 IL App (1st) 151189, ¶ 20. The circuit court's determination as to whether the petitioner has met that burden will not be disturbed

unless it is against the manifest weight of the evidence. *Richardson v. Booker*, 2022 IL App (1st) 211055, ¶ 44. We find that McClellan failed to do so.

¶ 74    We have already determined that McClellan failed to establish that Hull was a family or household member because there was no dating relationship between them. His EOP petition and testimony at the *ex parte* hearing on April 23, 2021, did not establish such a relationship. This was not cured by his testimony at the later rehearing, where he testified that he "intended" to have a dating relationship with Hull, despite the circuit court's finding that McClellan's testimony supported standing for a dating relationship. Nor do we agree with the court's finding that the "attempt" to start a dating relationship was equal to the existence of a dating relationship between the parties. We also take issue with the circuit court's finding that sending nude photos, kissing and engaging in oral sex established the existence of a dating relationship. The Domestic Violence Act is very clear on what constitutes a dating relationship (750 ILCS 60/103(6) (West 2020)), and the "intent" to have one is not the same as having one. The failure to establish that Hull was a family or household is fatal to the petition because the Domestic Violence Act is intended to protect victims of domestic abuse. Those not in a dating relationship do not fall within the protection of the statute. The error of granting McClellan's petition for an EOP without the requisite familial relationship was compounded by the circuit court's grant of EOP after rehearing and the plenary OP which should not have happened. We reiterate that McClellan was not entitled to any remedy under the Domestic Violence Act because he was not a person protected under the Act. Thus, we find that the entry of the plenary OP against Hull was against the manifest weight of the evidence and must be reversed.

¶ 75    Our conclusion makes it unnecessary to address the other issues raised by Hull on this appeal regarding other reasons why the plenary OP should be reversed.

¶ 76                    F. Hull's Petition for a Civil No Contact Order (CNCO)

¶ 77        Hull also contends that her petition for a civil no contact order (CNCO) should have been granted or alternately, that she should be granted a new hearing on her petition.

¶ 78        In deciding whether to grant the CNCO, the issue before the circuit court was whether non-consensual sexual penetration occurred on March 19, 2021. The issue before this court then is whether the circuit court correctly found the facts show by a preponderance of the evidence that Hull was not entitled to a plenary civil no contact order. *J.M. v. Briseno*, 2011 IL App (1st) 091073, ¶ 39. We review the circuit court's finding under a manifest weight of the evidence standard. *Id*. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 79        The purpose of the Civil No Contact Order Act (Act) is to provide a civil remedy for victims of reported sexual assault that are not prosecuted to protect them from future interactions with the offender. 740 ILCS 22/102 (West 2020). A petition under the Act may be filed by any person who is a victim of non-consensual sexual conduct or non-consensual penetration, including a single incident of such conduct. 740 ILCS 22/201(1) (West 2020). Sexual penetration means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person. 740 ILCS 22/103 (West 2020). Evidence of the emission of semen is not required to prove sexual penetration and the court may not require physical injury to the victim in determining whether to issue a CNCO. 740 ILCS 22/103, 213(a) (West 2020). The Act provides that if the court finds that the petitioner has been a victim of non-consensual sexual conduct or non-consensual penetration, a CNCO shall be issued. 740 ILCS 22/213(a)(West 2020).

¶ 80    The standard of proof in a proceeding under the Act is proof by a preponderance of the evidence. 740 ILCS 22/204 (West 2020). A preponderance of the evidence means that the evidence presented renders a fact more likely than not. *J.M.*, 2011 IL App (1st) 091073, ¶ 41 (citing *People v. Brown*, 229 Ill. 2d 374, 385 (2008)).

¶ 81    Turning to the case at bar, as noted above, Hull's CNCO petition was filed on January 12, 2022, and raised statutory allegations that McClellan engaged in non-consensual sexual penetration with her. At the hearing on Hull's petition, the circuit court found that Hull's testimony was full of contradictions and that it was clear from the testimony presented by both parties that the parties engaged in consensual contact of kissing, removal of Hull's clothes and oral sex. The court further found that based on the testimony presented, when Hull pushed McClellan away during vaginal sex, he stopped, they got dressed and McClellan took Hull home. The court considered evidence presented by Hull that she did not like McClellan yet met up with him twice. The court concluded that it did not know what occurred in the car but found that Hull's credibility was at issue and it was not clear by a preponderance of the evidence that non-consensual sex occurred.

¶ 82    We first note that the circuit court incorrectly considered the parties' consensual conduct of meeting up, smoking, kissing, removing of clothes and oral sex; this conduct was irrelevant to consideration of the CNCO petition. The only relevant issue was whether there was non-consensual sexual contact between the parties. 740 ILCS 22/213(a) (West 2020). The circuit court's conclusion that Hull failed to meet her burden by a preponderance of the evidence is evident on the record before us. While the parties' testimony was contradictory as to the specific events that happened in the car, both agreed that there was kissing, oral sex, and penetrative sex. However, they disagreed about whether the penetrative sex was consensual.

The circuit court found that Hull was less credible due to contradictions in her testimony. Based on the record before us, we cannot conclude that the opposite conclusion is clearly evident due to the contradictory nature of the testimony. We therefore affirm the denial of Hull's petition for a CNCO.

¶ 83                                    CONCLUSION

¶ 84        In conclusion, we find that the circuit court's grant of the initial EOP to McClellan after an *ex parte* hearing was against the manifest weight of the evidence; the grant of the plenary OP was against the manifest weight of the evidence; and the denial of Hull's petition for a CNCO was not against the manifest weight of the evidence. The judgment of the circuit court is affirmed in part and reversed in part.

¶ 85        Affirmed in part; reversed in part.