NOTICE

Decision filed 10/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250317-U

NO. 5-25-0317

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| TARA N. LANDSTROM, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Piatt County. |
| | ) | |
| v. | ) | No. 24-OP-97 |
| | ) | |
| CAROL L. ARTEMAN, | ) | Honorable |
| | ) | Dana C. Rhoades, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding of abuse, as defined by the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2024)), was not against the manifest weight of the evidence. The trial court did not err in declining to admit into evidence a response to the respondent's attorney's Freedom of Information Act request. The trial court did not abuse its discretion by including the petitioner's minor daughters as protected parties.

¶ 2    The respondent, Carol L. Arteman, appeals a plenary order of protection entered in favor of Carol's daughter, the petitioner, Tara N. Landstrom. Carol argues that (1) the trial court's finding of abuse was against the manifest weight of the evidence; (2) the court erred in excluding from evidence a response to Carol's attorney's Freedom of Information Act (FOIA) request seeking records of a police report filed by Tara; (3) the court abused its discretion in naming Tara's children as protected parties in the order; (4) the court erred in entering an order of protection

1

where it found that the abuse was infrequent; and (5) deficiencies in Carol's attorney's performance deprived her of a fair hearing.

¶ 3    Tara has not filed a brief in this matter. Carol filed a motion for summary relief, asserting that her brief "demonstrates *prima facie* reversible error" and arguing that we may therefore grant summary relief due to Tara's failure to respond. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). For the reasons that follow, we deny Carol's motion for summary relief and affirm the order of the trial court.

¶ 4                                I. BACKGROUND

¶ 5    On December 26, 2024, Tara filed a petition seeking both a plenary order of protection and an emergency order of protection against Carol. Tara requested a two-year plenary order of protection for herself and her two daughters, K.L. and N.L. The trial court entered an emergency order of protection that day following a hearing. The emergency order was extended three times.

¶ 6    On March 20, 2025, a plenary hearing was held. Tara testified that she lived with her husband, Jacob Landstrom, and their two daughters, nine-year-old K.L. and six-year-old N.L. She testified that her mother, Carol, stayed at their home from May 13, 2024, until July 5, 2024. Tara explained that on the night of May 13, Carol called her "after she had gotten out of jail" and asked for a place to stay. Tara picked Carol up from the jail, drove to Carol's home to pick up some of her belongings, and then brought Carol to Tara's home.

¶ 7    Tara stated that on July 5, 2024, Carol arrived home between 10:45 and 11 p.m. She stated that Carol was very loud when she came home and woke both children. Tara told Carol her behavior was "inappropriate." In response, Carol screamed at Tara and called her "an ungrateful bitch" and "a horrible mother." According to Tara, Carol "chose to leave that night." As Carol took her belongings to her vehicle, she "was stomping up and down the hallway." After taking one

load to her car, Carol opened the door to N.L.'s bedroom, where both girls were, and yelled at the girls, telling them that it was Tara's fault they would never see her again.

¶ 8    Tara testified that when Carol returned to the house from taking some of her possessions to her vehicle, Tara met her on the porch and told her she was no longer welcome in the house because she had scared the children. Tara stated that she offered to retrieve Carol's remaining belongings for her and Carol then "came at me and put her hands on my throat and tried to choke me." Tara testified that Carol attempted to choke her three times, but each time, she was able to remove Carol's hands from her throat. She described what happened after the third time as follows: "I took her and myself both to the ground, and I was behind her, and then I just gave her a bear hug and held her hands." According to Tara, she released Carol from the bear hug when Carol calmed down, which took approximately three minutes.

¶ 9    Tara testified that the children asked why their grandmother was behaving the way she was, and she told them she did not know. The children told Tara they did not want to see Carol again. Tara testified that after the incident, she was afraid that Carol might harm her or her children if she returned to their home. Although Tara indicated that she did not sustain injuries as a result of the incident, she stated that for two days after it happened, "it was very hard to breathe and to talk" because she felt pressure against her throat. She further testified, "I felt those handprints around my throat for a month." She was not asked to clarify whether this meant there were visible handprints on her throat.

¶ 10    Tara noted that Carol had a history of alcohol abuse and indicated that she was intoxicated on the night of July 5, 2024. Asked how she knew Carol was intoxicated that night, Tara replied, "When she was—when she came in that night, she wasn't walking in a straight line down the hallway. It appears she was stumbling a little."

3

¶ 11    Tara acknowledged that she had no contact with her mother after this incident until Christmas Day. She noted that she blocked Carol on Facebook and on her phone.

¶ 12    Carol next showed up at Tara's home on December 25, 2024, at approximately 5 p.m. Tara's husband, Jacob, encountered Carol putting gifts on the back porch when he went outside to let their dogs into the house. Jacob alerted Tara to Carol's presence, and Tara told the two girls to wait in N.L.'s bedroom while she went outside to confront Carol.

¶ 13    According to Tara, she told Carol she was not welcome because of the July 5 incident and that her family did not want the gifts she brought them. She testified that Carol responded by telling her she would never leave Tara or the children alone. Tara informed Carol that she and her children "did not want anything to do with her." At this point, Carol began "yelling and screaming" at Tara, calling her "a horrible mother and an ungrateful bitch." Tara testified, "[S]he stepped forward and got face-to-face with me." At this point, Jacob came outside, stepped between Tara and Carol, and told Carol to leave the property. Tara testified that Jacob had to tell Carol to leave three times before she did so. As Carol walked to her car, she told Tara she wished that she had choked her harder.

¶ 14    Tara testified that she was "very upset" by the incident. She called the police after Carol left, and she filed a petition for an order of protection the following day. She testified that she would fear for her safety and that of her daughters if the court did not grant her petition.

¶ 15    On cross-examination, Tara testified that she was 34 years old and weighed 130 pounds. She acknowledged that she did not call the police after the July 5 incident. Counsel asked Tara about the presence of cameras in her home. She acknowledged that there were cameras in the home and that she did not provide video footage as evidence of either incident. She noted that there was

4

no camera on the back porch, and she explained that although there was a camera in the hallway, she did not believe it had an SD card.

¶ 16    Tara testified that her daughters were happy to spend time with their grandmother while she was staying with them. She denied that Carol provided childcare on weekdays during this period, but she acknowledged that Carol took care of the girls and took them on outings on the weekends. She testified that, although the children enjoyed spending time with Carol before the July 5, 2024, incident, they no longer wanted to see her after the incident because she "scared [them] half to death." Tara indicated that the children did not ask to see Carol after the incident occurred.

¶ 17    Tara denied telling Carol earlier in the day on July 5, 2024, that she must move out by August 1. She also denied asking Carol to come back as she was leaving that night. Asked why she did not file a police report after the July 5 incident, Tara replied, "[B]ecause she was my mother and I didn't want her going to jail, because her husband has called the police on her and I chose not to do that."

¶ 18    Carol's attorney questioned Tara concerning her testimony that she called the police after the December 25, 2024, incident. The following exchange occurred:

"MR. SARM [(Carol's attorney)]: Now you claim that on December 25, 2024, you, after confrontation with Miss Arteman, after your husband intervened, you called the police and made—and filed a report; is that correct?

A. That is correct.

Q. Would it surprise you if I FOIA'd the police report from December 25, 2024, and I received a response that said after checking our CAD for any reports—

MS. SHAW [(Tara's attorney)]: Objection, Your Honor, hearsay.

5

THE COURT: Sustained as to what law enforcement told you, Mr. Sarm.

Q. Would it surprise you that there was actually no report generated?

A. It would.

Q. Would it surprise you if there was information that you didn't file a report, but all you did was ask questions?

A. It would surprise me. I had two cops show up at my doorstep because I had called to file a report."

¶ 19 Jacob testified that he and Tara had been together for 10 years and had been married for 2½ years. During that time, he spent time with Carol during holidays and at other family events. Asked to describe Carol's demeanor, he replied, "Fine for the most part unless any type of drinking was involved, and then it would change."

¶ 20 Jacob was not home when the July 5, 2024, incident occurred. However, he testified that he was driving home from a pool tournament that night when he received a call from Tara. She told him she had an altercation with her mother. According to Jacob, Tara sounded upset during the phone call and seemed upset when he arrived home. Although Jacob did not specify the exact time Tara called him or when he arrived home, he indicated that he left the tournament at approximately 10:15 or 10:20 p.m. and that the drive home took 20 to 25 minutes. He further testified that he had no contact with Carol after that incident until she showed up at his home on Christmas.

¶ 21 Concerning the December 25, 2024, incident, Jacob testified that at approximately 5:25 or 5:30 p.m. that evening, he was outside letting the dogs in when he saw Carol getting things out of her car. He went inside with the dogs and told Tara that "there was someone outside that she needed to probably talk to." He went into the game room, and his two daughters were in N.L.'s

6

bedroom together. He testified that he could hear Tara and Carol arguing, noting that the game room was located near the back door, where they were standing. Jacob testified that at some point, he stepped outside and saw that Carol was "nose-to-nose" with Tara. He stepped between them and told Carol to leave. According to Jacob, Carol indicated she was leaving, but she stated that she wanted the items she had brought. He stepped aside to allow her to retrieve the items, then followed her down the porch steps to the edge of the lawn. He testified that Carol "threw everything in the back of her car" and said that she wished she had choked Tara harder "the last time."

¶ 22    On cross-examination, Jacob denied telling Carol that he would "bury" her during the confrontation that occurred on December 25, 2024. He further denied "belly-bumping" Carol or touching her in any way. He acknowledged that a few weeks before the July 5, 2024, incident, he told Carol she would never see his children again if she returned to her husband. On redirect examination, Jacob was asked to explain why he made this threat. He replied:

> "Because with the past history of the altercations with her and her husband and the drinking involved, and that was never going to stop, and he said that was part of the problem. I didn't want my kids in the situation to where drinking was involved and something happening to them."

¶ 23    Carol testified that she was 53 years old and weighed 100 pounds. She acknowledged that she drank socially, explaining that she typically would drink a margarita once a week when she went out for Mexican food. Carol acknowledged that she had a driving under the influence charge 20 years earlier, but she testified that she had no other criminal history.

¶ 24    Carol described the July 5, 2024, incident. She stated that she came home that night and went into K.L.'s bedroom, which is across the hall from Tara's bedroom. According to Carol, Tara's door was open, and Tara was "laying there playing on her phone." Carol testified that N.L.

7

"came barreling out of her room and into [K.L.]'s room." Both girls were jumping up and down telling her how happy they were to see her and telling her about their days. Carol explained that she tried to quiet the girls down because Tara "was bellowing and telling me how it was very rude of me to be coming in so late and that I have no respect, and that we needed to quiet down."

¶ 25    Carol next testified that she went into the bathroom to get ready for bed. The confrontation with Tara began after she stepped out. According to Carol, Tara was at the end of the hallway, looking "very mad with her hand on her hip." Tara cussed and screamed at Carol. Carol testified that she offered to move out of the house on Sunday (two days later), but Tara "told me the 'F' if I will, I will be out of there Saturday, as in tomorrow." According to Carol, there was a camera in the hallway, and she knew that it worked.

¶ 26    Carol acknowledged that she swore at Tara but denied trying to choke Tara. Counsel asked, "Do you think even if you had wanted to choke her, that given your weight and your height and your age, that could have done so?" Carol replied, "No."

¶ 27    In describing the confrontation that occurred on the porch, Carol explained that as she returned from placing a load of clothes in her car, Tara informed her she would not let her into the house to retrieve the remainder of her belongings. Carol's contacts and dentures were among the things still in the house. Carol told Tara, "yes you are," and walked toward the doorway. At this point, according to Carol, Tara shoved her, causing her to fall and land on her knee. After pushing her down, Tara sat on Carol. Carol testified, "And yes, I had bodily injury and a big fat bruise and hurt my knee for three weeks." She acknowledged, however, that she did not seek medical attention, explaining that because of a preexisting knee injury, "they can't really fix it, per say [*sic*], without replacing it."

8

¶ 28    According to Carol, Tara did not offer to retrieve her belongings for her, but Tara eventually relented and allowed her to get her contacts and dentures. Carol also managed to retrieve three bags of clothing she had left just inside the door.

¶ 29    Carol denied that Tara told her never to come back. Rather, she testified that Tara told her to "knock it off and stop taking [her] stuff to the car." She further testified that Tara threatened to stop speaking to her if she did not stay.

¶ 30    Regarding the December 25, 2024, incident, Carol testified that she went to Tara's house that day with gifts for the entire family in the back seat of her car. She set the gifts on the back porch, knocked on the door, and handed Tara a bowl of sausage and crackers. According to Carol, she wished Tara a Merry Christmas and began leaving, but Tara told her to "take this shit and you leave." Carol testified that Jacob then came out of the house. She stated, "He come bum-rushing me. I don't know what you call it, like a man doing a body check, sumo body wrestler, belly bump, I don't know, but he hit me with his whole torso from here to here [and] almost knocked me backwards off the porch." She noted that the porch post blocked her fall. She testified that Jacob slammed into her a second time, after which she told him she would call the police if he ever touched her again.

¶ 31    Carol identified Respondent's Exhibit 1 as a screenshot of a text message exchange between her and Tara. The exhibit was admitted into evidence. It showed that, on January 26, 2024, Tara wrote, "*** contact either myself or Ms. Collins.[1] I have shared the email with her. Imma kill [K.L.]." Carol's response contained several emojis and K.L.'s full name. Tara then sent a message stating, "I handed her a knife and told her to murder me." The message included a shrugging emoji and a laughing emoji. The exhibit showed that Carol replied, "Tara Nichole."

---

[1]The beginning of first text message is cut off in the screenshot.

9

Tara's next message said, "What hard lessons learned up n [*sic*] this household." Carol responded, "R u trying to traumatize the kid," to which Tara replied, "Oh she's fine." In her testimony, Carol explained that Ms. Collins was either K.L.'s teacher or the principal of her school and that the discussion related to K.L. misbehaving at school.

¶ 32    Carol testified that she would never put her granddaughters in harm's way. She further testified that the allegations in Tara's complaint were "[a]bsolutely one hundred percent false."

¶ 33    On cross-examination, Carol acknowledged that she had an altercation with her husband in May 2024, but she stated that it was verbal, not physical. She explained that they were considering divorce. She acknowledged that the altercation led to her arrest. However, she explained that this was "by Dewitt County's choice, not my husband's or anything I said or did to him." She emphasized that she was released "without even going to court." Carol denied that she asked Tara to pick her up that night. She testified, "I was just going to call whoever I could or walk to my sister's and find a ride and figure out what I was going to do." She testified, however, that Tara did, in fact, pick her up that night and that Tara allowed her to stay at her home.

¶ 34    Carol acknowledged that she did not provide photographs as evidence that Tara inflicted bruises on her on July 5, 2024, and that she did not call 9-1-1 after the incident. She admitted that she went to Tara's house unannounced on December 25, 2024. She further admitted that she did not call the police that day despite describing Jacob's actions as an "assault."

¶ 35     In explaining its ruling from the bench, the trial court found that Tara met her burden of proving abuse as defined by the Domestic Violence Act. However, the court further found that, based upon "the frequency, and in this case I would say infrequency since there's been no contact between the parties for such a long period of time, *** I don't think a two-year order of protection is necessary." The court noted that the emergency order of protection had already been in effect

for three months at the time of the hearing and then stated that it would enter a nine-month plenary order of protection, resulting in "a total of a one-year order of protection in total."

¶ 36    The trial court entered a plenary order of protection that day. The order protected Tara, K.L., and N.L., and indicated that it would expire at 4:05 p.m. on December 20, 2025. This timely *pro se* appeal followed.

¶ 37                                II. ANALYSIS

¶ 38    In her brief, Carol argues that (1) the trial court's finding of abuse was against the manifest weight of the evidence; (2) the court erred in excluding from evidence the response to her attorney's FOIA request; (3) the court abused its discretion in naming K.L. and N.L. as protected parties; (4) the court erred in entering an order of protection despite finding the abuse was infrequent; and (5) her attorney's deficiencies deprived her of a fair hearing. In her motion for summary relief, Carol contends that her brief demonstrates "*prima facie* reversible error," and that we may therefore summarily reverse the trial court's ruling in light of Tara's failure to file an appellee's brief. We disagree.

¶ 39    We first address the effect of Tara's failure to file a brief in this matter. Where, as here, the record is simple and the issues raised are such that the appellate court can easily address them without the aid of an appellee's brief, we may decide the merits of the appeal. See *McClellan v. Hull*, 2023 IL App (1st) 220465, ¶ 43; *Talandis*, 63 Ill. 2d at 133. We therefore choose to address the merits of Carol's arguments.

¶ 40    Turning our attention to those arguments, we next consider Carol's claim that the trial court's finding of abuse was against the manifest weight of the evidence. The Domestic Violence Act provides that the trial court shall issue an order of protection if it finds that the person requesting the order "has been abused by a family or household member." 750 ILCS 60/214(a)

11

(West 2024). The central inquiry in proceedings under the Domestic Violence Act is whether the petitioner has been abused. *McClellan*, 2023 IL App (1st) 220465, ¶ 56. We will reverse a trial court's finding on that question only if it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence if it is unreasonable, arbitrary, or not based on the evidence in the record or if the opposite conclusion is clearly evident. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 41    Here, there is no question that Carol, as Tara's mother, falls within the statutory definition of a family or household member. See 750 ILCS 60/103(6) (West 2024) (defining "family or household member" to include a parent). There is likewise no real question that Tara's allegations, if believed, constitute "abuse" within the meaning of the Domestic Violence Act. The statutory definition of abuse includes both physical abuse and harassment. *Id.* § 103(1). The statute defines harassment as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). In this case, Tara alleged that Carol physically abused her by attempting to choke her three times and that she yelled and cursed at her, accused her of being a terrible mother, told her children she was to blame if they never saw their grandmother again, and informed her that she would never leave her or her children alone. We believe this course of conduct would cause a reasonable person emotional distress, and Tara testified that it upset her and caused her to fear for her safety.

¶ 42    Carol does not dispute that these allegations fit within the Domestic Violence Act's definition of abuse. Instead, she contends that Tara failed to present sufficient evidence to prove her allegations. We disagree.

12

¶ 43　　In support of her claim that the evidence was insufficient to prove abuse within the meaning of the Domestic Violence Act, Carol first asserts that there was no evidence to corroborate Tara's testimony that Carol attempted to choke her. She notes that the record contains no evidence of a police report, medical records, or photographs of her handprints on Tara's throat. In addition, Carol contends that Jacob's "corroboration of the choking statement" was undermined by the fact that he was not present when the incident occurred.

¶ 44　　There are three flaws in Carol's argument. First, the Domestic Violence Act explicitly provides that the trial court may not require evidence of "physical manifestations of abuse on the person of the victim" in deciding whether to grant relief. *Id.* § 214(a). Second, Carol's argument mischaracterizes Jacob's testimony concerning the choking incident. Jacob did not testify that he witnessed the incident or that it occurred; he merely testified that Carol said she should have choked Tara harder. Jacob was present during the incident in which both he and Tara testified that they heard this statement. Third, and most importantly, the trial court was in the best position to observe the demeanor and conduct of the witnesses and parties. *Best*, 223 Ill. 2d at 350. As such, we give deference to its credibility determinations and will not substitute our judgment for that of the trial court with respect to the credibility of witnesses. *Id.* at 350-51. The trial court was thus entitled to find Tara's testimony concerning the incident credible with or without corroborating evidence.

¶ 45　　Carol next challenges the testimony concerning her intoxication. She argues that Tara's testimony that she was intoxicated when she came in on July 5, 2024, was contradicted by the evidence that Tara was asleep when Carol arrived home. This argument misconstrues the pertinent testimony. Tara testified that Carol woke her up when she came home that night, and she later testified that she observed Carol stumbling in the hallway and not walking straight. Carol also

asserts that Jacob's testimony that she was sometimes intoxicated at family gatherings was contradicted by the affidavits of seven other family members. However, these affidavits were not entered into evidence during the hearing.

¶ 46    Carol's final argument concerning the evidence of the July 5, 2024, incident revolves around a "discrepancy" between Tara and Jacob's testimony as to the time the incident occurred. As Carol points out, Tara testified that Carol arrived home that night at approximately 10:45 to 11 p.m. Jacob, however, testified that he left a pool tournament at approximately 10:15 or 10:20 p.m. and that the drive home took 20 to 25 minutes. This meant that he arrived home at 10:45 p.m. at the latest, and, as discussed previously, the incident occurred before he returned home. However, we do not believe a minor discrepancy in testimony concerning the precise timing of an event renders that testimony inherently unbelievable. Moreover, as stated previously, we defer to the trial court's credibility determinations. See *id*.

¶ 47    Carol also contends that the evidence concerning the December 25, 2024, incident was undermined by evidence that Tara did not file a police report. As she appears to acknowledge, however, no such evidence was admitted. She argues that the trial court erred in excluding evidence of a response to her attorney's FOIA request, an argument we will address next. However, even assuming for the sake of argument that the evidence was improperly excluded, we do not believe it would have rendered Tara and Jacob's testimony concerning the incident inherently unreliable. During his cross-examination of Tara, Carol's attorney characterized the FOIA response as stating that police records indicated Tara only asked questions. Based upon this characterization, admission of the response would have confirmed Tara's allegation that she called the police after the incident.

14

¶ 48     Next, Carol argues that the court erred in excluding evidence of the response to her attorney's FOIA request. She argues that it was admissible under an exception to the hearsay rule found in Illinois Rule of Evidence 803(8) (eff. Jan. 25, 2023) and that its exclusion allowed Tara's testimony to go unchallenged. We disagree.

¶ 49     We review a trial court's evidentiary rulings for an abuse of discretion. *Capsel v. Burwell*, 2024 IL App (3d) 230170, ¶ 24. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person could take the view adopted by the trial court. *Id.*

¶ 50     Under the hearsay exception cited by Carol, public records or reports are admissible if they set forth the activities of a governmental office or agency or "matters observed pursuant to [a] duty imposed by law." Ill. R. Evid. 803(8)(A), (B) (eff. Jan. 25, 2023). Police reports are not admissible under this exception. See *Capsel*, 2024 IL App (3d) 230170, ¶ 31; Ill. R. Evid. 803(8)(B) (eff. Jan. 25, 2023). The absence of a public record is ordinarily subject to proof by either testimony or a document certifying that a "diligent search failed to disclose the record." Ill. R. Evid. 803(10) (eff. Jan. 25, 2023). The certification must comply with the requirements of Illinois Rule of Evidence 902 (eff. Sept. 28, 2018). See Ill. R. Evid. 803(10) (eff. Jan. 25, 2023). There is no indication that the FOIA response received by Carol's attorney complied with the certification requirements of Rule of Evidence 902 or set forth the activities of a public office.

¶ 51     Moreover, even assuming the FOIA response qualifies under either of these exceptions, there is another important limitation to its admission. A witness may not testify about any matter absent evidence that he or she has personal knowledge of the matter. *Capsel*, 2024 IL App (3d) 230170, ¶ 38; Ill. R. Evid. 602 (eff. Jan. 1, 2011). Counsel attempted to introduce the evidence through the testimony of Tara. However, there is no evidence that Tara had any personal

15

knowledge of the response Carol's attorney received to his FOIA request. Thus, the trial court correctly excluded it from evidence. See *Benson v. Stafford*, 407 Ill. App. 3d 902, 912 (2010) (explaining that the appellate court may affirm the trial court's ruling on any basis appearing in the record, regardless of whether the trial court relied on that basis in its ruling). The court did not abuse its discretion.

¶ 52   Carol next contends that the court abused its discretion by including K.L. and N.L. as protected individuals under the order. She argues that there was no evidence that she abused either of the girls. However, the Domestic Violence Act provides protection not only to "any person abused by a family or household member"; it also protects "any person residing or employed at a private home *** which is housing an abused family or household member." 750 ILCS 60/201(a)(i), (iv) (West 2024). Undisputed evidence showed that K.L. and N.L. resided in the same home as Tara. Therefore, they are protected under the Domestic Violence Act and including them in the order was appropriate. We find no error.

¶ 53   Carol further argues that the court erred in entering an order of protection where it found the abuse to be infrequent. We disagree.

¶ 54   The Domestic Violence Act requires courts to consider the frequency of past abuse in determining whether to grant relief. *Id.* § 214(c)(1)(i). Here, the court complied with this requirement by expressly considering the frequency of abuse. Although the court found that an order of protection was warranted, the court further found that, due to the infrequency of abuse, the two-year order requested by Tara was not warranted.

¶ 55   Significantly, the court must also consider the likelihood of future abuse. *Id.* Prohibition of abuse is an appropriate remedy where abuse "has occurred or otherwise appears likely to occur if not prohibited." *Id.* § 214(b)(1). Although not specifically highlighted by the trial court, we

16

reiterate that there was evidence in this case that the second incident occurred because Carol returned to Tara's home despite being told she was no longer welcome there after the first incident, and there was evidence that Carol told Tara she would never leave her or her children alone. In light of this evidence, we cannot find the court's decision to enter a nine-month order of protection to be against the manifest weight of the evidence.

¶ 56    Finally, Carol argues that deficiencies in her attorney's performance rendered the proceedings unfair. She points to counsel's failure to authenticate the FOIA response and have it admitted into evidence, and she additionally asserts that her attorney made two mistakes during closing argument. First, she notes that in referring to the text messages shown in Exhibit 1, counsel argued that Tara "told her daughter to stab herself with a pair of scissors." As discussed earlier, the exchange included a text saying, "I handed her a knife and told her to murder me," followed by emojis indicating Tara said this in jest. Second, Carol asserts that counsel misstated the standard of proof as "beyond a reasonable doubt," when the correct standard of proof is a preponderance of the evidence. See *id.* § 205(a). We note that counsel initially argued, correctly, that it was Tara's burden to prove her allegations by a preponderance of the evidence. He later argued, however, "I do not believe based on the evidence presented by the petitioner, that they have proved their case beyond a reasonable doubt." Carol contends that the cumulative effect of these mistakes rendered the hearing unfair. We are not persuaded.

¶ 57    We reject Carol's contention for two reasons. First and foremost, proceedings under the Domestic Violence Act are civil in nature and are subject to the rules of civil procedure. *Id*. As such, there is no right to the assistance of counsel. See *In re T.W.*, 166 Ill. App. 3d 1022, 1026-27 (1988).

17

¶ 58    Second, Carol does not explain how any of these alleged mistakes adversely impacted her defense. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring an appellant's brief to contain the reasons for an appellant's contentions of error and providing that points not argued are forfeited). As we have already discussed, the FOIA response would have confirmed Tara's allegation that she contacted police after the second incident. Further, the trial court was aware of the appropriate standard of review and of the contents of Respondent's Exhibit 1. Counsel's purported errors did not render the proceedings unfair or provide a basis for reversal.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we deny Carol's motion for summary relief and affirm the trial court's order.


¶ 61    Motion denied; order affirmed.